IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JANIS S. WAITE,

                       Plaintiff,                      OPINION AND ORDER

    v.

                                              16-cv-643-wmc

WOOD COUNTY, WISCONSIN,

                       Defendant.

After approximately a ten and a half year period of employment as a correctional officer at the Wood County Jail, plaintiff Janis Waite ("Waite") was fired in April 2013. Three years later, she sued Wood County, alleging adverse actions and a hostile work environment based on her sex, as well as retaliation. Following discovery, the County moved for summary judgment. (Dkt. #13.) For the reasons discussed below, that motion is granted in part and denied in part.

UNDISPUTED FACTS[1]

The parties detail -- and dispute -- much of Waite's employment history, including

---

[1] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted below. At the outset, however, the court addresses the rampant use of hearsay objections in the parties' responses to the proposed findings of fact. By and large these are ill-founded for the following reasons: (1) the statements are not being offered for the truth of the matter asserted, *see* Fed. R. Evid. 801(c); (2) often the statements fall into the category of an opposing party's statement, *see* Fed. R. Evid. 801(d)(2); (3) the statements were records of a regularly conducted activity, *see* Fed. R. Evid. 803(6); (4) the statements constituted a present sense impression, *see* Fed. R. Evid. 803(1); or (5) the statements are those of then-existing mental, emotional, or physical condition, *see* Fed. R. Evid. 803(3). The court will not address these repetitive boilerplate hearsay challenges. While the parties may raise *reasonable* objections at trial, the court also reminds counsel that lay witnesses are permitted to testify to their opinions based on their perception of events, *see* Fed. R. Evid. 701, and as such the court will not take lightly to "speculative" objections in response to testimony clearly based on a witness's observations. Finally, defendant's repetitive objection that plaintiff's affidavit is "self-serving" is baseless. *See Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013)

events within a few years of her hiring. Because the relevance of earlier events is unclear, the court will focus its attention on the key events surrounding Waite's employment and firing. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but 'whether the employee was performing well at the time of [her] termination.'" (alteration in original) (quoting *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991))); *but see id.* ("[P]rior job performance 'evaluations, standing alone, [do not] create a genuine issue of triable fact when . . . there have been substantial alterations in the employee's responsibilities and supervision in the intervening period.'" (alteration in original) (quoting *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998))).

## A. Background

Waite worked as a correctional officer in the Wood County Sheriff's Department Jail Division from October 23, 2002, until she was fired on April 12, 2013. As of March 2013, the Wood County Sheriff's Department employed nine male and nine female correctional officers.

---

(explaining that "'self-serving' is not an illegitimate basis to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment" and overruling cases "to the extent that they suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute"). The court takes particular pains to point out these basic rules of evidence in the hopes of avoiding similar abuses of objections in the parties' pretrial submissions. Forewarned, any repetition may be the subject of appropriate sanctions.

At the Wood County Jail, potential discipline for correctional officers is first investigated by the jail sergeant, who reports to the jail administrator; following their review, a proposed response is submitted to the sheriff for review. During the relevant period, Theodore Ashbeck was the jail administrator, Angie Jochimsen was the jail sergeant and Tom Reichert was the sheriff. Other Wood County employees included Ed Reed, the human resources director, and correctional officers Susanna Knapp, Ron Zager, Matt Crane, Byron Wirth, and Trzinski.[2]

## B. Waite's 2012 Performance Review

Waite's annual evaluations from 2009-2011 indicate that her job performance met or exceeded requirements (2009-2011 Performance Reviews (dkt. #15-19) 2-7), but her October 24, 2012 annual review specified that she "[n]eed[ed] some improvement to meet requirements" regarding organizational ability, job knowledge and dependability, and criticized her for "not complet[ing] her daily tasks in a timely manner," "repetitively ask[ing] basic questions that she knows the answers [to]," and "us[ing] the maximum number of sick days allowed for the 4th year in a row" (2012 Performance Review (dkt. #15-20) 2-3). Waite disputes whether this 2012 performance review accurately described her actual performance, adding that when confronted, her evaluator said that he had been told to give her that evaluation.

The next day, October 25, 2012, Waite met with the sheriff and undersheriff to discuss her evaluation. Waite told them that she considered her evaluation to be

[2] The latter's first name is not apparent in cited portions of the record.

harassment, adding that she had done everything asked and performed her tasks the same way that lead correctional officers Wirth and Zager did their tasks. Waite also expressed surprise that she would have to go through her experience in Adams County again (Waite Aff. (dkt. #27) ¶ 20), apparently referencing her gender discrimination lawsuit against another former employer, Adams County, although Waite does not put forward evidence that the sheriff or undersheriff knew what she meant. The County disputes this account, asserting instead that she stopped at the sheriff's office to "blow off steam." Although not denying it, Sheriff Reichert also does not recall Waite implying that she was going to bring a gender discrimination suit, nor her referencing the earlier Adams County lawsuit.

## C. Waite's Disciplinary Actions in 2013

In the first part of 2013, Waite's job problems continued to escalate. She was disciplined a number of times, including some penalties that were decreased through the grievance process. Waite alleges that each of these disciplinary actions resulted from a retaliatory period of intense scrutiny by the Sheriff's Department.

### 1. Midnight Request for Time Off in Early January

The first such claim of retaliation began after midnight on January 10, 2013, when Waite called the jail asking if she could come in late for her shift starting at 7 a.m. that morning. Waite alleges that she asked to use 2.5 hours of vacation time, while the County claims she said she was "too drunk" to work and asked for 2.5 hours of sick time. Jail Administrator Ashbeck called back later to ask how Waite was feeling and told her that he was reaching out because he had heard she had called in as too drunk to work. Waite told

Ashbeck that that was not true, but rather her company had stayed too late that night. When Waite arrived at work later that day, she met with Administrator Ashbeck and Sergeant Jochimsen. When Ashbeck offered to refer her to the employee assistance program, Waite denied having a drinking problem, explaining that she had been joking with the staff during the earlier call requesting the time off. Administrator Ashbeck warned her against starting rumors about herself. She received a "Verbal Reprimand," which was reduced to "a non-disciplinary caution" following review of the grievance complaint by the County HR Director Ed Reed.[3]

### 2. Events Leading to a Final Written Warning in February

On February 15, 2013, Waite next received a "Final Written Warning" for events on January 31 and February 3, 4 and 12. (*See* Final Written Warning (dkt. #15-23) 2, 4.) The parties agree that on January 31, Waite was on speakerphone with a member of the public and that while on the phone, profanity was used, although they disagree by whom. The County alleges that Waite used profanity, while Waite alleges that another officer, Matt Crane, did. (*See* Def.'s Resp. to Pl.'s Resp. to Def.'s PFOF (dkt. #36) ¶ 53.) The parties also disagree about who witnessed this event. Regardless, Crane was not disciplined, and following this event, staff could not use a speakerphone to answer calls.[4]

---

[3] Waite alleges that she received a simple "warning," while the County of Wood Disciplinary Action Form points out that she signed a "Verbal Reprimand" on February 15, 2013. (*See* Feb. 15, 2013 Disciplinary Action Form (dkt. #15-21) at 2.) The difference is immaterial since there is no dispute that the reprimand, which Waite does not dispute signing, was ultimately reduced to a caution.

[4] Waite avers that on March 12, 2013, Officers Wirth and Trzinski nevertheless used a speakerphone while speaking to a state court judge's secretary. When Jail Administrator Ashbeck walked in, Wirth apologized for using the speakerphone, but Waite avers that Ashbeck answered "I don't fuckin care." The County denies this event.

The parties also disagree about the events on February 3 and 4. The County asserts that on the 3rd, Waite was seen sleeping at work, and Waite told a colleague that she was having difficulty staying awake and had fallen asleep repeatedly. Waite disputes sleeping at work, and she denies making those statements because she was not even at work. Similarly, on the 4th, the County asserts that Waite was again observed sleeping at work, this time following several failures to respond to a colleague requesting a head count via radio. Waite disputes this as well, also averring that the 4th was a Monday, which would have made work too busy for her to fall asleep. Waite also avers that following her request for recordings of radio transmissions, she was informed that there were none due to an equipment malfunction.[5] Waite further disputes the County's assertion that she again admitted to difficulty staying awake following this second incident.

Finally, on February 12, Waite reported to work after taking Vicodin earlier that morning. The County does not dispute that Waite did so enough hours before work that it did not impact her work. While the parties disagree who observed Waite's performance that day, they agree that Waite told Lead Correctional Officer Wirth about the Vicodin and that she felt "like an airhead, spacey and tired." (Def.'s Reply to Pl.'s Resp. PFOF (dkt. #36) ¶ 61.) They also agree that Waite asked Wirth not to tell anyone and that

---

[5] The County disputes that she requested radio recordings.

Wirth was reprimanded for not reporting the Vicodin use up the chain of command.[6]

### 3.  February Meetings with Sergeant Jochimsen and Administrator Ashbeck

The following day, February 13, Waite met with Jail Sergeant Jochimsen.  During the meeting, Waite acknowledged telling Officer Wirth that she had felt "spacey and tired" the day before and had asked him not to say anything.  Waite also admitted to difficulty focusing at work because of financial issues and to feeling tired all the time.  Waite disputes admitting to falling asleep on February 3 or 4.  The parties agree that Waite became upset during the February 13 meeting, but dispute the reason why.  The County asserts Waite was upset because Jochimsen noted that she had not improved since her last evaluation, while Waite asserts she became upset because she felt targeted.  Specifically, Waite alleges that she "wanted to know why the male officers were not being talked to about how they were doing their work."  (Pl.'s Opp'n (dkt. #19) 20).  In contrast, the County asserts that April 12, 2013, was the first time Waite told Ashbeck and Jochimsen that she was being treated differently from male officers.  The parties agree that Waite used profanity to express her frustrations during the February 13 meeting.

On February 15, Waite met with Jail Administrator Ashbeck, as well as sheriff department investigator Shawn Becker.  During the meeting, Waite received a verbal reprimand for her post-midnight call on January 10 and a "Final Written Warning."  At

---

[6] That same day, Waite also told a Wisconsin Rapids officer to "keep [his] pants on" and called him a "crabass" over the intercom system in response to his displeasure at having to wait for the sally port doors to open.  (Def.'s Reply to Pl.'s Resp. PFOF (dkt. #26) ¶ 65.)  The parties disagree whether Ashbeck sent an apology letter to the Wisconsin Rapids Police Chief.  The parties also dispute whether there were complaints about delayed responses of phone and intercom calls, and delays in gaining access to the jail while Waite was on door control duty.

this meeting, Waite avers that she again complained about unfair treatment, identifying complaints about Officers Zager, Crane and Wirth not doing their jobs that resulted in no discipline. Waite further maintains that Ashbeck responded that he was not concerned about them, only about her. In response, the County contends that Waite again failed to identify disparate treatment based on sex as a concern at this meeting, and Ashbeck actually responded that he was focusing on her employment situation during that meeting and would separately address complaints about the other officers.

During a conversation on February 19, Waite further avers that she informed Sergeant Jochimsen that she had contacted a lawyer to save her job. Following Waite's receipt of the Final Written Warning, Waite also filed a formal grievance, which resulted in the dismissal of some of the alleged violations, although the reprimand remained as a Final Written Warning.[7] The parties disagree whether Waite was required to participate in the employee assistance program, but agree that she received remedial training on her responsibilities as a correctional officer for five days (February 16-21, 2013).

### 4. Two More Verbal Reprimands

Waite received two, additional Verbal Reprimands for her conduct on February 27. First, she faxed three pages to the clerk of the Juneau County Court on behalf of a neighbor, who was involved in a child support proceeding, using a Wood County fax machine. For

---

[7] The letter from Reed reviewing the Final Written Warning is dated April 12, 2013, the date on which Waite was terminated, supporting the possible inference that the letter was merely to support her firing. While the County disputes this as self-serving, speculative hearsay, the court agrees that this is an inference that a reasonable trier of fact might reach.

this, she received a Verbal Reprimand for using department property for personal purposes without getting permission first. The parties agree that Section 104.15.B of the Rules of Conduct states that "Employees shall not use any department property for private purposes unless permission is first obtained from the Sheriff or his designee," although Waite contends, with support from Officer Wirth, that this section was not followed. In response to Waite's assertion that "[e]mployees commonly used department equipment for personal purpose[s] and were not required to get permission," Wood County asserts that this was only because no one reported other personal use contemporaneously for investigation, emphasizing that there was still a policy requiring advanced permission. The "corrective action" listed on the disciplinary action form was that "[p]rior to using department property or equipment CO Waite will get permission from administration." (Mar. 1 Disciplinary Action Form #1 (dkt. #15-27) 2.)

The second reprimand resulted from Waite providing a receipt to a person who wanted to deposit $100 into an inmate's account and crediting that amount to the account, despite not yet receiving the $100. Waite explains that she did not collect the money because Officer Zager did and then handed it to her, but the County asserts this was only because Zager stopped the visitor to collect the money. Regardless, the parties agree that the typical protocol for depositing funds is for the correctional officer to collect the money *before* crediting the deposit and issuing a receipt, and Waite failed to follow this protocol. They likewise agree that the corrective action identified on the disciplinary action form was for Waite to "attach the money to the receipt being kept by the Wood County Jail to assure she has collected the money prior to giving a customer/visitor/inmate a receipt."

(Mar. 1 Disciplinary Action Form #2 (dkt. #15-28) 2.)[8]

### 5. Waite Is Suspended for Locking Herself in a Cell with an Inmate

The parties agree that on March 14, 2013, Waite got locked in a cell with an inmate, but disagree about the circumstances surrounding this event. Waite avers that this happened inadvertently; she had her radio and keys with her; she was in no danger; and there were other correctional officers nearby laughing at her. In response, the County does not concede that the occurrence was inadvertent, contests that she had neither her radio nor her keys, and disputes her assertion of other officers being nearby. Additionally, the County asserts that Waite banged on the cell door and yelled to get herself released. The parties also disagree about the seriousness of this event. There is no dispute that Waite received a one-day suspension.

At the time, Waite told Sergeant Jochimsen and Administrator Ashbeck that others had previously locked themselves in cells with inmates. The parties dispute whether the County investigated this claim and whether that investigation resulted in no specifically identifiable occurrences. The County has identified three correctional officers (two male and one female) who subsequently received verbal reprimands for locking themselves in

---

[8] Waite also claims that there were frequent problems with the accuracy of inmate accounts, but that no one else was disciplined for improper handling of inmate account monies. She specifically refers the court to one such situation from March 12, 2013, in which the sheriff's secretary informed Beyer of a $400 error in an inmate's account that had to be replaced with money from petty cash. The County disputes this. The only error the County acknowledges was discovered through an audit, which determined that a button was pressed twice, such that reversing the charge corrected the error and no discipline was warranted. The County also suggests that Waite herself may have made multiple entries into the accounting software resulting in an excess of $128, but that she was not disciplined because an investigation could not figure out what had happened.

cells with inmates in October 2013 and May 2014.[9]

Waite then met with Sheriff Reichert on March 15, 2013. Waite contends that she claimed the disciplinary action against her was the result of discrimination based on her sex, specifically identifying correctional officers Crane and Zager as having locked themselves in cells in the past. The County disputes that Waite told Reichert either of those things. Waite also told Reichert about other correctional officers allowing inmates to escape by leaving cell doors open -- without discipline -- and that a visitor had discovered Jail Administrator Ashbeck had put his gun in his gun locker but left the key in the locker door -- also without discipline. The County disputes all of these allegations as well. Waite further told Sheriff Reichert that she did not expect to have to endure the same kind of discriminatory treatment she endured in Adams County and that Reichert could stop it, explaining that her treatment was differential, discriminatory and unfair, constituted harassment, and created a hostile work environment. Finally, Waite told him that she had contacted an attorney. The County disputes these allegations as well.

The parties agree that Waite told Sheriff Reichert at the March 15 meeting that she would not be facing discipline if she were male. (Waite Aff. (dkt. #27) ¶ 63). Waite alleges that Reichert responded that "the last time [he] looked it was obvious [she] w[as] still a woman." (*Id.* ¶ 64.) The County does not dispute that Sheriff Reichert made this statement, but contends he did so in October 2012 and denies any discriminatory intent. (*See* Def.'s Resp. PFOF (dkt. #27) ¶ 94.)

---

[9] Waite does not dispute these events, but argues that the warnings were prompted by her complaint of disparate treatment before the ERD.

### 6. Waite Is Suspended for Using Department Office Equipment for Personal Use without Permission

On March 17, 2013, after calling in sick earlier that day, Waite was in the jail around 11 p.m. At this time, she was apparently in civilian clothes and printing documents from the computer system and using the department copy machine without getting permission. Waite agrees that an August 2008 directive sent to correctional officers provided that they were "not [to] come into the compound after [their] normal working hours wearing civilian attire," but disagrees that it was enforced. In addition, Waite again disputes that prior permission was required, alleging that it was common for staff to use department equipment for personal purposes without prior permission.[10]

Waite received a three-day suspension, which was justified in part by the previous warning that she needed permission to use department property for personal purposes. The resulting disciplinary action form further warned Waite that "[a]ny further violation of Wood County Policy, Wood County Jail Procedures, Directives or Work Rules may result in termination." (Mar. 20 Disciplinary Action Form (dkt. #15-33) 3.) The disciplinary action form also instructed that she "refrain from intimidating fellow co-workers because of recent disciplinary action," and if she had "comments or concerns as a result of recent discipline she will address those concerns to administration and not other correction[s] staff." (*Id.*)

---

[10] The parties agree that the documents being printed and copied were related to a workplace grievance, but disagree whether that made them "work-related" and whether she had permission from HR Director Reed to copy them, or even whether he was able to provide permission.

**D. Waite Is Terminated for Involvement in Razor Collection**

The parties agree that the policy established by the sheriff's department governs the distribution and collection of razors to inmates, including that a list be created detailing inmates who received a razor, with those inmates' names then crossed out as razors are collected. That list is only discarded once all the razors have been collected. If a correctional officer who did not distribute the razors collects one, he or she must ensure it is documented on the razor list. Failure to follow this protocol is considered a serious safety-related rule violation.

As with many of the other material claims of misconduct in this case, the parties disagree about what happened on April 1 and 3, 2013. The County states that on April 1, an inmate returned a razor to Officer Knapp, indicating that Waite "didn't pick this one up with the others." (Def.'s Reply to Pl.'s Resp. PFOF (dkt. #36) ¶ 116.) Knapp searched for the razor list but could not find it. Knapp also told Waite about the razor she had received, but Waite did not respond. Sergeant Jochimsen then determined that Waite had not been assigned to razor collection, but had collected "3 of the 4 razors from J Block and threw out the razor list." (April 12 Disciplinary Action Form (dkt. #15-34) 2.)[11] Waite denies any involvement with razors on April 1, including throwing out the razor list. She avers instead that the Trust Fund Charges Record shows she was only briefly in the cell block where Officer Knapp collected the razor, and then only to assist a nurse. Waite further avers that Officers Knapp and Wirth did not get the trust fund entries list and did

---

[11] The Disciplinary Action Form does not explain how Jochimsen came to these conclusions.

not report that a razor was missing. Finally, Waite disputes Jochimsen's findings. The parties agree that based on Sergeant Jochimsen's investigation, Waite received a five-day suspension.

Turning to April 3, the parties agree that an inmate surrendered two razors to Officer Knapp while she was passing out lunch trays, and Knapp again claimed to be unable to locate either of the razor lists that had been created that day.[12] Waite does not dispute that Knapp asked her if she had discarded the lists and that Waite did not answer. Knapp reported this to a supervisor. Waite disputes that an ensuing investigation led her to admit to discarding a razor list on April 3, *and* she denies doing so. Waite also points out that Officers Knapp and Zager failed to retrieve the trust fund entries list and failed to report the missing razors. In contrast, the County alleges that an investigation determined Waite had failed to follow safety protocols on April 3 by discarding the razor list before all the razors had been collected, which again created a serious safety hazard. Waite disputes these findings, but agrees that the findings led to her termination on April 12, 2013.

### E. Grievance Process and Alleged Continuing Retaliation

Along with her union representative John Spiegelhoff, Waite met with HR Director Reed on April 4, 2013, to discuss her grievance disputing the January and February discipline. In addition to discussing the bases for that discipline, Waite emphasized during the meeting that she was a good employee, as evidenced by her working past the conclusion of her shift without seeking compensation. The parties dispute Reed's motivation in doing

---

[12] The parties agree that there were two lists created on April 3, 2013 so that a copy could be used at each end of the jail as the razors were collected.

so, but agree that he then asked that she detail the days and hours she worked beyond her shift over the past two years and that she do so within ten working days. Waite was also told failure to provide the information within that timeframe would subject her to further discipline -- specifically, termination.[13]

Waite's Union Representative Spiegelhoff also attended a grievance meeting on April 30, 2013, to discuss her use of the copy machine in March. Spiegelhoff purports to having recorded that meeting, unbeknownst to HR Director Reed.[14] Waite avers that Reed acknowledged responsibility for Waite making the copies that resulted in her suspension and that Reed had implicitly given her permission to use the copy machine by asking her for copies of those materials. These allegations, too, are denied by the County, although that grievance was discussed at a County Board Executive committee meeting, at which Waite claimed Reed had acknowledged giving consent to her making copies. Reed denied that. Waite then acknowledged the grievance meeting had been recorded.

Reed wrote a letter characterizing the recording as "a serious breach of good faith" and an apparent "direct violation of the 'Use of Electronic Recording Devices' policy." (Aug. 7, 2013 Letter (dkt. #15-40) 2.) Reed informed Waite that disciplinary proceedings related to the recording would be "held in abeyance," since Waite had already been

---

[13] While plaintiff would make much of a subsequent email in which Administrator Ashbeck and Sheriff Reichert reference the possibility of bringing criminal charges against her for falsifying her overtime compensation request, no charges followed. Even so, the County claims that her submission included requests for days she did not work, hours she had already been paid for, and other inconsistencies.

[14] Defendant does not dispute that Waite represented having the recording, although it notes the recording was not been produced by plaintiff and that defendant was advised that the recording "no longer exists."

terminated, but should she be reinstated, that matter would be referred to her supervisor and an investigation could also lead to discipline or termination. (*Id.*)

### F. Wood County's History of Discipline of Other Officers

While the parties agree that thirteen other correctional officers were disciplined between January 1, 2010 and July 10, 2015, Waite alleges that they received lesser punishments for similar -- or worse -- missteps, including:

- Andreas Netz received a 30-day suspension for directing that a jail door remain open to improve ventilation, resulting in the escape of a prisoner.

- Thomas Wolosek received a 10-day suspension for failing to follow the department's communication policy, resulting in a prisoner being improperly released for 10 days. This occurred a month after Wolosek received a 5-day suspension for witnessing inappropriate sexual activities by inmates and providing commentary instead of reporting the incident to administration.

- David Beyer received a 3-day suspension for failing to intervene in the aforementioned inappropriate inmate sexual activities, as well as a 1-day suspension for sending an inmate to the hospital because of stomach pains without informing anyone nor following up on his condition costing the County $9,000.

- Alan Marcoux received a 3-day suspension after admitting that he failed to perform checks inside prisoner cells for the better part of a year.

- Michael Guilfoyle received a 3-day suspension after removing shackles from a prisoner, who then pushed him and escaped.

The County agrees that it handed out these instances of discipline, but distinguishes them from Waite's based on the officers' disciplinary records, the jail's progressive discipline format, and other factors. There is no dispute that Waite was the only officer terminated during this timeframe, although another female officer apparently chose to resign in lieu of being terminated for smuggling contraband into the jail.

Waite compiled a list of seven other instances in 2013 where she observed her colleagues -- both male and female -- using department computers for personal purposes. She alleges that they were not disciplined. The County objects to the relevance of this, since there is no evidence it had constructive knowledge of these events.

## OPINION

Plaintiff asserts adverse action and hostile work environment claims based on her sex, as well as retaliation for complaining about this discrimination. Defendant moves for summary judgment, arguing that plaintiff cannot make a prima facie showing, and even if she could, defendant had an appropriate, non-discriminatory basis for terminating her. Defendant also asserts that she cannot prove retaliation during or after her employment.

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, evidence is viewed "in the light most favorable to the non-moving party," but the "'court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence.'" *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (citing *Abdullahi v. City of Madison*, 423 F.3d 763, 769, 773 (7th Cir. 2005)).

Under this standard, defendant does not begin to clear the first hurdle to plaintiff's pre-termination retaliation and discrimination claims, for which there are numerous, material factual disputes precluding summary judgment, including whether defendant's reason for firing her was pretextual. Still, summary judgment will be granted on plaintiff's hostile work environment and post-termination retaliation claims.

## I. Plaintiff's Sex Discrimination Claim

Title VII prohibits employers from discriminating "against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a). In an employment discrimination case, the question at summary judgment is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action[,]" with "all evidence belong[ing] in a single pile and . . . evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016). Put another way, "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Board of Trs. Of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Defendant seeks summary judgment on the basis that plaintiff has failed to put forth sufficient evidence to demonstrate that she was disciplined and ultimately terminated because of her sex. While the Seventh Circuit has endorsed collapsing the direct and indirect methods, the *McDonnell Douglas* framework may still be useful. *Ortiz*, 834 F.3d at 765-66.[15] Under the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of discrimination by establishing that "'(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate

---

[15] For example, in *David*, the Seventh Circuit concluded that the plaintiff had not put forward sufficient evidence on her disparate pay claim under Title VII and the ADEA, finding in part because her selected comparators were not comparable (based on job requirements); the court also looked at all the evidence outside the *McDonnell Douglas* paradigm, concluding that there was nothing in the record to support an inference that the decisions of the community college were based on David's race, sex, or age. 846 F.3d at 227-29.

expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer.'" *David*, 846 F.3d at 225 (alteration in original) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765). Once the plaintiff has made this initial showing, the employer must put forth a nondiscriminatory, legitimate reason for the adverse employment action; and if it does so, then the plaintiff must show that the employer's explanation is pretextual. *Id.* (quoting *Andrews*, 743 F.3d at 234). For example, where the severity of the adverse action is incongruous to the alleged infraction -- such that the employer is "swatting a fly with a sledge hammer" -- this may be evidence of pretext. *Stalter v. Wal–Mart Stores, Inc.,* 195 F.3d 285, 289 (7th Cir. 1999) (recognizing that pretext can be established by showing that the employer's purported reasons were insufficient to motivate the adverse employment action).

Here, the parties agree that Waite, as a woman, is a member of a protected class, and they agree that she was subject to adverse action,[16] but disagree as to whether she met the defendant's employer's legitimate expectations and whether she was treated worse than her similarly-situated male colleagues. These two factors actually merge, as they do here, because plaintiff has produced enough evidence to "raise an inference that [her] employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated male . . . employees in a more favorable manner)," which

---

[16] Defendant emphasizes its reliance on a progressive discipline policy, but does not clearly articulate the position that this prevents plaintiff from establishing the element of adverse action.

allows plaintiff to make her prima facie case. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).[17]   Moreover, the analysis in determining whether employees are "similarly situated" is "flexible, common-sense, and factual." *David*, 846 F.3d at 225-26 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012)).  As the Seventh Circuit has explained:

> Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not have identical employment files.  *So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly situated requirement is satisfied.*  Which factors are material is a case-specific inquiry that depends on the specifics of the defendant's decision and the stated reason for it.

*Good v. Univ. of Chic.*, 673 F.3d 670, 675-76 (7th Cir. 2012) (emphasis added) (internal citations and quotation marks omitted), *overruled on other grounds by Ortiz*, 834 F.3d at 764-65.

As for meeting her employer's job expectations, plaintiff argues that a reasonable jury could conclude that she did so based on her pre-2012 evaluations alone, which largely show that her performance met or exceeded requirements.   Moreover, there is no

---

[17] For example, the Seventh Circuit affirmed summary judgment in *Peele* because the plaintiff failed to show that her poor job performance (the alleged reason for firing her) was pretextual.  Among other things, plaintiff argued that the evidence was weak and denied her performance was materially deficient; compared her performance reviews to other employees to show disparate application of the employment expectations; and alleged that the company was trying to cut costs by removing older workers and that her supervisor wanted a younger, maler office.  288 F.3d at 327-28. Nevertheless, the Seventh Circuit found the evidence of the plaintiff's worsening job performance to be overwhelming:  she had received nine written evaluations critical of her performance and she did not challenge the accuracy of these criticisms.  *Id*. at 328.  The court declined to consider earlier, positive evaluations because the plaintiff had changed job titles and responsibilities.  *Id*. at 329. Finally, the court concluded that she failed to identify similarly situated colleagues outside her protected class who had been treated better.  *Id*. at 330-31.

suggestion that Waite's job title or the bulk of her responsibilities changed before 2012. While defendant relies on her 2012 evaluation and the alleged behavior warranting repeated disciplinary actions in 2013 to prove that her performance failed to meet these expectations, plaintiff has credibly disputed the accuracy of that evaluation and of the allegations underlying much of her later discipline. Additionally, plaintiff can credibly argue on this record that much of her disciplinary record constituted retaliation for her complaints of harassment, unless the jury disbelieves her claim that she complained to her supervisor about sex discrimination early and often. There are, therefore, factual disputes as to whether plaintiff met her employer's reasonable expectations of job performance.

This conclusion is strengthened by considering the defendant's treatment of plaintiff's male colleagues. Typically, to establish that a colleague is "similarly situated," a plaintiff must show that her "comparator": "(1) dealt with the same supervisor, (2) w[as] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Orton-Bell*, 759 F.3d at 777 (alteration in original) (quoting *Coleman*, 667 F.3d at 847 (internal quotation marks omitted)). Here, plaintiff cites a number of examples of male correctional officers who appear similarly situated but punished less harshly for similar or worse behavior. For instance, the three correctional officers who were disciplined for locking themselves in cells with inmates received only

verbal reprimands.[18] Similarly, other male correctional officers appear to have received suspensions -- not terminations -- for actions that permitted prisoners to escape or be improperly released, while plaintiff was terminated for her disputed role in the collection of razors.

Likewise, plaintiff was suspended for using a department computer and copy machine, yet her former colleague testified that: it was *common* for employees to use the copy machine to copy personal materials and to use the computers for personal internet browsing; he was unaware of anyone other than plaintiff being reprimanded for using the copy machine; and he had used the copy machine after work without consequence. (Wirth Tr. (dkt. #23) 5-7.) Plaintiff also can testify about the personal use of office equipment that she witnessed.[19] As for her three-day suspension, it was the same length as male correctional officers' suspensions for: unshackling a prisoner and permitting his escape; failing to perform cell checks for most of a year; and failing to intervene in inappropriate sexual activities of inmates -- all of which appear *far* more serious than photocopying and

---

[18] The fact that one of the verbally reprimanded officers was female may cut against plaintiff's claim that she was targeted because of her sex, supporting instead the theory that she was targeted for other, unprotected reasons, a theory not without support. (*See* Pl.'s Opp'n (dkt. #19) 4 ("A jury could reasonably find that Lt. Ashbeck as the new jail administrator wanted to establish his authority as a supervisor and selected Waite, a divorced woman whose performance had been criticized earlier in her employment[,] to establish his reputation as a supervisor . . . .").) Notably, Title VII only protects against harassment and discrimination on the basis of an enumerated protected status, like sex, not on the basis of other grounds, even if unsavory.

[19] Plaintiff similarly details instances where her colleagues used profanity or talked about drinking without rebuke as support for her retaliation claim, although reliance on some of the logs appear to be hearsay within hearsay and were not considered by the court. Plaintiff's list of her colleagues using the office equipment for personal purposes differs from those concerning use of profanity and discussing drinking because this list is not based on out-of-court statements. Further, this list is different in that it likely falls into the present sense impression exception to the bar against hearsay.

printing twelve pages on plaintiff's night off, especially when the copies appear work related anyway. (*See* Wood County Discipline Summary (dkt. #15-31) 1-2; Pl.'s Opp'n (dkt. #19) 40, 52.) Similarly, her five-day suspension was the same length as that of a male officer who was being disciplined for witnessing inappropriate sexual activities by inmates and providing commentary over the radio, instead of reporting the event, compared to Waite's disputed role in razor collection. (*See* Pl.'s Opp'n (dkt. #19) 52.) This evidence could also be used by a jury to find that defendant's stated reason for firing plaintiff was pretextual.

Finally, there is no reason to believe that the male correctional officers answered to a different supervisor. On the contrary, it appears that there was one jail sergeant, jail administrator and county sheriff. Nor were the officers governed by different codes of conduct. Plaintiff's infractions appear to be either similar or markedly less serious than those of her male counterparts; defendant's arguments that facts distinguish the male correctional officers from plaintiff may prevail at trial, but not summary judgment. Accordingly, plaintiff's sex discrimination claims will proceed.

## II. Plaintiff's Hostile Work Environment Claim

A plaintiff must establish four elements to avoid summary judgment on a hostile work environment claim: "(1) the work environment must have been both subjectively and objectively offensive; (2) her gender must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)). Waite has failed to make this necessary

showing.  *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d. 892, 901 (7th Cir. 2003) (noting that "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events" (internal citation and quotation marks omitted)).  Instead, in response to defendant's motion for summary judgment on her hostile work environment claim, Waite simply argues that the County failed to "allege that Waite was not subjected to a hostile work environment by its repeated discipline of Waite and threats of still further discipline . . . . Thus, it must be found for purpose[s] of its summary judgment motion that the County . . . subjected her to a hostile work environment."  (Pl.'s Opp'n (dkt. #19) 34.)

Even if the court were willing to undertake plaintiff's job of marshalling evidence of a hostile work environment, the court can find none here.  Instead, plaintiff marshals evidence of a straightforward sex discrimination claim that apparently began in earnest in the last few months of her employment and for the most part after she herself had raised a specter of sex discrimination.  Not only is there no evidence of any subtle or overt sexual harassment or hostility towards her or other female officers on this record, even in the last few months of her employment, she offers no evidence of such conduct. This does not come close to the necessary showing to stave off summary judgment on plaintiff's hostile work environment claim.

### III. Plaintiff's Retaliation Claim

Title VII would be rather toothless if it did not "protect[] persons not just from certain forms of job discrimination [and harassment], but [also] from retaliation for complaining about the types of discrimination it prohibits."  *Miller v. Am. Family Mut. Ins.*

*Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); 42 U.S.C. § 2000e-3(a).  A plaintiff can only prevail on a retaliation claim if she proves that she:  "(1) opposed an unlawful employment practice under Title VII; (2) was the object of an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice."  *Congleton v. Oneida Cty.*, No. 16-cv-412-wmc, 2017 WL 4621117, at *16 (W.D. Wis. Oct. 13, 2017) (citing *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000)).  This requires the plaintiff to have complained about discrimination based on a protected class; failing to indicate a connection to a protected status -- either explicitly or through facts establishing that inference -- is insufficient.  *Orton-Bell*, 759 F.3d at 776 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)) (affirming summary judgment on retaliation claim where plaintiff failed to link complaint to protected status as a woman, such that complaint could not be basis for retaliation claim); *see also Miller*, 203 F.3d at 1007-08 (explaining that "[a]n employee, of course, need not use the words 'pregnancy discrimination' to bring her speech within Title VII's retaliation protections. But she has to at least say something to indicate her pregnancy is an issue.  An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.").

Accordingly, the question here boils down to "whether an employer has acted in such a way that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Porter v. City of Chic.*, 700 F.3d 944, 957 (7th Cir. 2012) (quoting *Thompson v. N. Am. Stairless, LP*, 131 S.Ct. 863, 868 (2011)).  While defendant

contends that Waite did not claim that she was being treated differently as compared to male officers until April 12, 2013, that is a hotly disputed, material issue of fact. Plaintiff claims that she lodged such a complaint at least by the end of October 2012, following her first unsatisfactory performance review. Specifically, on October 25, 2012, she reports personally meeting with the sheriff and undersheriff and informing them that she considered the negative comments in her evaluation to be harassment, adding that she did not expect to have to go through what she had in Adams County again. Even so, this meeting cannot be the basis for her retaliation claim, because she has yet to offer any evidence establishing that the sheriff or undersheriff knew what had happened to her in Adams County or her sex discrimination lawsuit. Without this, plaintiff cannot establish that she complained about discrimination based on sex. Her claim that this initial complaint led to a retaliatory "campaign of intense scrutiny" thus fails, at least on the record at summary judgment.

Still, that was just the first time plaintiff reports complaining about harassment based on sex. On February 13, 2013, Waite alleges that during her meeting with Jail Sargent Jochimsen she became upset because she was being held to a higher standard than the male officers, whose work was not being similarly examined. This type of alleged statement would provide sufficient information for Jochimsen to infer that Waite was complaining about being discriminated against based on her sex. *See Orton-Bell*, 759 F.3d at 776 ("a 'complainant must indicate the discrimination occurred because of sex . . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is

insufficient.'" (quoting *Tomanovich*, 457 F.3d at 663)).  Moreover, two days later, plaintiff received a verbal reprimand and a final written warning, followed shortly by two more verbal reprimands, two suspensions and, finally, termination.  Considering some of the bases for these disciplinary actions -- such as faxing three pages or using office equipment to provide requested documents to human resources -- and their timing in relation to her complaint of sex discrimination, a jury could reasonably find that these acts of discipline were retaliatory in nature.  Indeed, this finding would be buttressed here by plaintiff's account of her February 15, 2013, meeting at which she received a verbal reprimand and the final written warning.  In particular, she claims to have identified three male correctional officers who were not being punished despite not doing their jobs, to which Jail Administrator Ashbeck responded that he was only concerned about her, and not about them.  While Ashbeck may well, as he now claims, have been speaking only of his focus of *that* meeting, that was not plaintiff's understanding and, when viewed in context, it may not be the jury's.

Plaintiff also claims that she was retaliated against after her employment was terminated.[20]  Only "post-termination acts of retaliation that have a nexus to employment are actionable under Title VII," such that former employees can sue if they are complaining

---

[20] Contrary to plaintiff's assertion that defendant did not seek dismissal of her post-termination retaliation claim -- all while acknowledging defendant's request for its dismissal (*see* Pl.'s Opp'n (dkt. #19) 2) -- defendant did seek summary judgment on the basis that plaintiff could not establish that her former employer hampered her possible future employment (*see* Def.'s Summ. J. Br. (dkt. #14) 29-30; Def.'s Reply (dkt. #35) 39-40).  By simply incorrectly asserting that defendant failed to "develop[] argument" and declining to address that claim, plaintiff again missed her opportunity to marshal evidence countering defendant's affirmative request for summary judgment.

that retaliation "impinges on their future employment prospects or otherwise has a nexus to employment." *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 888, 891 (7th Cir. 1996). As seen in *Veprinsky*, acts of a former employer hampering a former employee's job search or injuring a former employee's relationship with a new employer may be actionable, however there must be some concrete injury. *Id.* at 894-95; *see also Moreno-Nicholas v. City of Indianapolis*, No. IP 98-1398-C H/G, 2000 WL 1701970 at *6 (S.D. Ind. Oct. 26, 2000) ("Allowing a former employee to proceed with a post-employment retaliation claim without evidence that the challenged conduct actually caused any harm would . . . provide remedies to former employees in situations where current employees would have none.").

Plaintiff's post-termination claim appears to rely heavily on the August 7, 2013 letter from HR Director Reed regarding Spiegelhoff's recording of a grievance meeting without prior notice or authorization. The letter calls this recording "a serious breach of good faith" and an apparent "direct violation of the 'Use of Electronic Recording Devices' policy," explaining that "[s]ince your employment has been terminated this matter will be held in abeyance. However, if your employment is reinstated this matter will be referred to your supervisor for possible disciplinary action to and including possible termination of you reemployment." (Aug. 7, 2013 Letter (dkt. #15-40) 2.) No reasonable jury could find that this letter caused any harm -- material or otherwise -- to plaintiff's future employment prospects, except perhaps to the prospects of future employment with defendant if reinstated by the court, which will be addressed at the final pretrial conference. The threat of referring the alleged policy violation to her supervisor if she were to be reinstated did not injure her chances of future employment elsewhere and is too remote to

constitute harm as relating to possible future employment with Wood County. Accordingly, the court will grant summary judgment to defendant on any post-termination retaliation claim, but not on the pre-termination, which is limited as set forth above.

ORDER

IT IS ORDERED that Defendant's motion for summary judgment (dkt. #13) is GRANTED IN PART AND DENIED IN PART as set forth above.

Entered this 9th day of November, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge